Filed 10/2/20  P. v. Torres CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE NUNEZ TORRES,<br><br>    Defendant and Appellant. | D075060<br><br><br>(Super. Ct. No. SCE364159) |

APPEAL from a judgment of the Superior Court of San Diego County, Evan P. Kirvin, Judge.  Affirmed.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina, Deputy Attorney General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Jose Nunez Torres appeals a judgment of conviction after a jury found him guilty of the first degree murder of Leticia Arroyo (Pen. Code,[1] § 187, subd. (a); count 8); three counts of evasion of a peace officer with reckless driving (Veh. Code, § 2800.2, subd. (a); counts 1, 15, and 16); one count of driving under the influence of a drug (former Veh. Code, § 23152, subd. (e); count 2); one count of possession of drug paraphernalia (Health and Saf. Code, § 11364; count 3); one count of willful failure to appear while on bail (Pen. Code, § 1320.5; count 4); two counts of vehicle theft (Veh. Code, § 10851, subd. (a); counts 5 and 10); three counts of first degree burglary (Pen. Code, §§ 459, 460, subd. (a); counts 6, 11, and 14); two counts of first degree robbery (Pen. Code, §§ 211, 212.5, subd. (a); counts 7 and 12); and two counts of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); counts 9 and 13).  The jury found true special circumstance allegations that defendant intentionally killed Arroyo by means of lying in wait (§ 190.2, subd. (a)(15)), and committed the murder while engaged in the commission of a first degree burglary and a robbery (*id.*, subd. (a)(17)(A), (G)).  It found true firearm enhancement allegations associated with counts 6, 7, 8, 11, and 12 (§§ 12022.5, subd. (a), 12022.53, subds. (b), (d)); allegations that defendant committed each burglary offense while another person was present on the premises (§ 667.5, subd. (c)(21)); and on-bail enhancement allegations.

The trial court sentenced Torres to prison for life without the possibility of parole, plus a consecutive term of 25 years to life, a consecutive term of 23 years four months, and a concurrent term of 360 days.  It sentenced him to

---

[1]    All further statutory references are to the Penal Code unless otherwise noted.

two additional consecutive terms of eight months each for convictions in trailing cases (case Nos. SCD267202 and SCS271159).

In this appeal, Torres raises the following arguments: (1) substantial evidence did not support the jury's lying-in-wait special circumstance finding or the jury's verdict for the burglary offense charged in count 14; (2) the prosecution relied exclusively on an extra-judicial admission to prove the corpus delicti for the possession of drug paraphernalia offense charged in count 3, in violation of the corpus delicti rule; (3) the trial court committed prejudicial evidentiary and instructional errors; and (4) the trial court violated his state and federal due process rights by imposing fines, fees, and penalty assessments as part of the sentence without conducting an ability-to-pay hearing.

We reject these contentions. Therefore, we affirm the judgment.

## II

## BACKGROUND

### 1

*The First High-Speed Chase (Counts 1–4)*

Early one morning in September 2016, a California Highway Patrol sergeant observed a vehicle exceeding the speed limit on the freeway. The sergeant activated the emergency lights of his patrol vehicle and pursued the speeding vehicle. The driver exited the freeway and feigned as though he were stopping, but then accelerated his vehicle and led the sergeant on a high-speed chase. During the pursuit, the driver swerved across lanes of traffic, failed to stop at a stop sign, and drove at speeds approaching 110 miles per hour.

The speeding vehicle crossed the international border into Mexico where authorities stopped it and detained its occupants. Torres was the

3

driver of the vehicle. He claimed he fled the sergeant because he was "unlicensed" and had an upcoming court date. He also admitted to smoking crystal methamphetamine in the vehicle 30 minutes before the chase. A later blood test produced a positive test result for the presence of amphetamines and methamphetamines.

Torres was charged with evading a peace officer while driving recklessly, driving under the influence of a drug, and possession of drug paraphernalia. He posted bail, was released from custody, and failed to appear at a court date shortly after his release.

2

*The Robbery and Murder of Leticia Arroyo (Counts 5–10)*

A few weeks later, Torres contacted a narcotics dealer named Leticia Arroyo, posed as a middle man for a buyer, and arranged to buy crystal methamphetamine from Arroyo at her apartment in Santee. The drug deal was delayed several times, causing Arroyo to send Torres a text message stating she felt "a little like [she was] being set up." Torres replied that he did not play "like that," and the drug deal was rescheduled.

Torres stole a Honda Accord and enlisted an acquaintance named Jaen Avila Soto (Avila) to accompany him to Arroyo's apartment. Torres picked up Avila, drove the stolen Honda Accord to Arroyo's apartment, and sent Arroyo a text message stating, "I'm outside." At trial, it was undisputed that either Torres or Avila shot and killed Arroyo at her apartment. The key disputed issue was which one of the two men killed her.

The People theorized that Torres was the killer. They elicited testimony from Avila that he accompanied Torres to Arroyo's apartment because Torres asked him whether he wanted to get high, and he believed Torres would get him methamphetamine. Avila testified Torres went into the

4

apartment and Avila moved from the passenger seat of the parked vehicle to the driver's seat. According to Avila, Torres returned to the vehicle 10 or 15 minutes later, loaded ammunition into a semiautomatic pistol, and then went back into the apartment. Avila testified a gunshot went off a "couple minutes" later and Torres ran out of the apartment with blood on his clothing. He testified Torres was "freaking out," weeping, and carrying four bags of crystal methamphetamine. Avila testified he drove himself and Torres away from the crime scene.

The People elicited testimony from another acquaintance of Torres named Anthony Moreno. According to Moreno, Torres told him before Arroyo's murder that he planned to commit a robbery, take the victim's drugs, and kill the victim. He testified Torres tried to recruit him to be the getaway driver, but he declined Torres's requests. He testified Torres came to him on the evening of Arroyo's murder, confessed he went through with the robbery and murder, and gave Moreno a bag of methamphetamine to hold for him. Moreno testified he hid the bag of methamphetamine for Torres.

Three key pieces of physical and forensic evidence linked Torres to Arroyo's murder as well. First, a criminalist at the San Diego Police Department testified she compared a cartridge casing recovered from the murder scene to cartridge casings from known test-fires of Torres's pistol. The cartridge casings shared the same unique markings and, therefore, the criminalist determined the cartridge casing from the murder scene came from Torres's pistol. Second, a latent fingerprint recovered from a deadbolt lock inside Arroyo's apartment matched Torres's fingerprint. Third, police recovered a pair of Torres's pants that were stained with Arroyo's blood.

The defense theorized that Avila killed Arroyo. It posited that Torres went to Arroyo's apartment to buy drugs, entered the apartment, locked the

5

door behind him, and got high with Arroyo while Avila remained outside in the parked vehicle. According to the defense, Torres then went back to the vehicle to get money for the drug deal, at which point Avila entered the apartment and shot Arroyo without provocation.

The defense did not call witnesses, but it cross-examined Avila concerning his version of the events. Among other topics, the defense questioned Avila about what he knew at the time he got into the Honda Accord with Torres. In an apparent effort to demonstrate that Avila planned or, at minimum, was aware of the impending killing, the defense asked Avila whether he asked Torres questions such as where they were going, who they were going to see, how far they were driving, or how long they would be gone. Avila replied no to each of these questions. The defense also elicited testimony from Avila that he did not speak with detectives about the murder until nearly two years after it occurred. During closing arguments, the defense argued Avila did not come forward about the murder because "he, too, was going to get charged with murder" if he did.

3

*The La Jolla Break-In (Counts 11–13)*

The day after the murder, Torres stole a second vehicle, a Honda Civic, which he and Moreno drove to the store to buy spray paint. Torres used the spray paint to disguise the Honda Accord he had previously stolen and driven to Arroyo's apartment. He also replaced a license plate on the Honda Accord with a different license plate.

About a week later, Torres and Moreno drove the newly painted Honda Accord to a car wash where drug deals were known to occur. A man named Gustavo Ceron approached Torres and Moreno in search of drugs. Ceron traded Torres and Moreno for methamphetamine and the men got high.

6

Torres and Ceron parted ways with Moreno and spent the rest of the evening driving across the county and getting high.  In the morning, they decided to commit a robbery and selected a home to target in La Jolla.  Torres donned a face covering, crawled through an open window in the home, and unlocked a door for Ceron to enter the home.  Ceron joined Torres inside the home and Torres forced the homeowner to lie on the ground at gunpoint.  Torres and Ceron took the homeowner's billfold, which contained credit cards and $17 in cash, and fled.

4

*The San Diego Break-In (Count 14)*

After committing the burglary in La Jolla, Torres and Ceron drove to a hotel in San Ysidro.  Ceron testified he asked Torres about the methamphetamine they had smoked and Torres confessed he stole it from a woman he "took out" a week earlier.  According to Ceron, Torres told him he shot the woman.  Ceron testified he was "shocked" by Torres's confession, stepped outside of the hotel room, and "didn't want to be in there" with Torres.

Torres and Ceron then drove to a nearby trailer park so Torres could run an errand.  Torres left his pistol inside the vehicle and went into the trailer park.  While Torres was in the trailer park, Ceron got into the driver seat of the Honda Accord and drove away.  Ceron stole the vehicle and the pistol left in the vehicle because he wanted to sell them and, according to Ceron, he "didn't care about [Torres] anymore."

Ceron parked the Honda Accord a few blocks from his own apartment, walked to his apartment, and contacted a family member to try to sell the pistol.  In the meantime, Torres and his other acquaintance, Moreno, located

7

the Honda Accord that Ceron had just taken from Torres. They recovered the vehicle and began searching for Ceron.

Torres and Moreno pulled up to another apartment under the apparent belief that Ceron lived there. However, they were mistaken; Ceron did not live there. Torres climbed into the other apartment through a window while Moreno remained outside. Torres encountered a tenant inside the unit and told him he was looking for someone with a Hispanic name, presumably referring to Ceron—the man who had just taken his vehicle and pistol. Moreno also told a neighbor they were looking for a Hispanic person. Torres and Moreno learned Ceron did not live at the apartment and left without further incident.

5

*The Second and Third High-Speed Chases (Counts 15–16)*

A few days later, a National City police officer observed the stolen Honda Accord, which did not have a front license plate, and activated the emergency lights on his patrol vehicle. The driver stopped the vehicle and the police officer exited his patrol vehicle. The driver then accelerated the vehicle and drove off at a high speed. The officer tried to pursue the speeding vehicle, but lost sight of it and the driver evaded arrest.

The following day, another National City police officer observed Torres parked in the Honda Accord in front of a shopping mall. The officer activated the emergency lights on his patrol vehicle and parked his patrol vehicle to try to block Torres's possible paths of escape. Torres evaded the road block and led the officer on a high-speed chase. During the chase, Torres exceeded the speed limit, ran through stop lights, and weaved through traffic. Torres ultimately crashed his vehicle and was taken into custody.

III

DISCUSSION

1

*Sufficiency of the Evidence*

A

*Legal Standard*

In a sufficiency of the evidence challenge, " ' " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" [Citation.]  In conducting such a review, we " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" [Citations.]  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." [Citation.]  These same principles apply to review of the sufficiency of the evidence to support a special circumstance finding.' " (*People v. Harris* (2013) 57 Cal.4th 804, 849.)

B

*Burglary Conviction (Count 14)*

The jury found Torres guilty of first degree burglary based on his entry into an apartment during his pursuit of Ceron.  Torres contends there was insufficient evidence to establish that he had the mental state necessary to commit the burglary.

"The elements of first degree burglary in California are (1) entry into a structure currently being used for dwelling purposes and (2) with the intent to commit a theft or a felony." (*People v. Sample* (2011) 200 Cal.App.4th 1253, 1261; §§ 459, 460, 490a.) Although a defendant commits burglary when he or she enters a designated structure with the intent to commit either a theft or a felony, the jury was instructed it could convict Torres only if it found he had the intent to commit a theft. Therefore, we focus our analysis solely on whether substantial evidence supported a finding that Torres intended to commit a theft. For the following reasons, we conclude it did.

At trial, Moreno testified he and Torres went searching for Ceron not only to find Ceron himself, but also to find the Honda Accord and the pistol Ceron took from Torres. Witnesses testified Torres and Moreno asked them during the break-in whether a Hispanic person lived in the apartment. This testimony gives rise to a reasonable inference that Torres believed— incorrectly, as it turned out—that Ceron lived in the apartment and entered it with the intent to find Ceron and commit a theft of the pistol. Further, an officer testified that the pistol in question was registered as a lost firearm in another state. From this evidence, a jury reasonably could find the pistol was not Torres's property and Torres had no claim of right over the pistol.[2]

Torres contends he could not have intended to take the pistol when he entered the apartment because he recovered the pistol before he entered the apartment. The record shows otherwise. Moreno testified that Torres

_____

[2] The fact that Ceron was not the true owner of the pistol is inapposite in determining whether Torres intended to commit a theft of the pistol. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 876 [" 'It is no defense to a charge of robbery (or of theft) that the victim was not the true owner of the property taken.' "]; *People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1143 ["[R]obbery may be committed against a person who is not the owner of property—indeed, it may be committed against a thief."].)

recovered the *Honda Accord* before he entered the apartment. However, he did not testify that Torres ever recovered the *pistol*. In fact, Ceron testified he took photographs of the pistol while he was in his bedroom, which he later used to advertise and sell the pistol to a buyer. This evidence tends to establish that Ceron removed the pistol from the Honda Accord before Torres regained possession of the Honda Accord and entered the apartment.

Torres also contends there was insufficient evidence to establish that he intended to commit a theft because he did not take the pistol or any other property from the apartment. However, as the People correctly note, "[o]ne may by liable for burglary upon entry with the requisite intent to commit a felony or a theft (whether felony or misdemeanor), regardless of … whether any felony or theft actually is committed." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041–1042; see *People v. Allen* (1999) 21 Cal.4th 846, 863, fn. 18 [recognizing the "settled rule that the gist of the [burglary] offense is *entry* with the proscribed intent, and that such an entry constitutes the completed crime of burglary 'regardless of ... any felony or theft actually is committed.' "].) Thus, the mere happenstance that Torres broke into the wrong apartment, and as a result was unable to seize the pistol, did not preclude the jury from finding that Torres intended to commit a theft at the time he entered the apartment.

C

*Lying-In-Wait Special Circumstance Finding*

The prosecution presented alternative theories of Torres's first degree murder liability for the killing of Arroyo: (1) the killing was committed by means of lying in wait; and (2) the killing was committed during the perpetration of a robbery or burglary. The jury found Torres guilty of first degree murder. It also found true an associated special circumstance

11

allegation that Torres killed Arroyo by means of lying in wait. (§ 190.2, subd. (a)(15).) Torres challenges the sufficiency of the evidence supporting the jury's lying-in-wait special circumstance finding.[3]

The lying-in-wait special circumstance requires proof of the following: " ' " ' "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) ... a surprise attack on an unsuspecting victim from a position of advantage …." ' " ' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 774.)

" ' " ' "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " [Citation.]' " [Citation.] As for the watching and waiting element, the purpose of this requirement "is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' [Citation.]" [Citation.] "The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 278 (*Cage*).)

Torres does not contest the sufficiency of the evidence establishing the intentionality of the murder, the element of concealment, or the element of

---

3    Torres does not challenge the sufficiency of the evidence supporting his first degree murder conviction under a lying-in-wait theory. However, "[i]f we find that 'the evidence supports the special circumstance, it necessarily supports the theory of first degree murder.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550.)

watching and waiting. Rather, he confines his challenge to whether there was substantial evidence of a surprise attack from a position of advantage.

Viewing the evidence in the light most favorable to the verdict, we conclude ample evidence supported a determination that Torres launched a surprise attack from a position of advantage. Torres sent text messages to Arroyo claiming he wanted to buy methamphetamine from her and denying he would set her up. On the day of the murder, he went into Arroyo's apartment for an initial visit of 10 to 15 minutes. Only then, according to Avila, did he exit the apartment and load ammunition into the pistol he used to shoot Arroyo a "couple minutes" later. From this evidence, a jury reasonably could infer Torres deliberately lured Arroyo into a false sense of security under the pretense of a drug deal, which he later exploited with a sudden and deadly attack. (*Cage*, *supra*, 62 Cal.4th at p. 280 [evidence supported lying-in-wait special circumstance where "defendant's surprise attack … followed in a continuous flow of events upon defendant's successful use of his ruse to persuade (the victim) to open her front door"].)

A surprise attack from a position of advantage can also be inferred from the physical evidence. The evidence indicates Arroyo was shot in the head with a single gunshot from behind. There was no indication she tried to fend off her attacker, even though she had several rifles and airsoft pistols in her apartment. Based on this evidence, a reasonable jury could conclude Torres—who gained entry into Arroyo's apartment under the pretense of a drug deal—came up to Arroyo from behind, took her by surprise, and shot her from a position of advantage. (See *People v. Johnson* (2016) 62 Cal.4th 600, 637 ["Lamb and Rump approached [the victim] from behind and, from that position of advantage, Lamb carried out a surprise attack by shooting [him] in the back of the head."]; *People v. Cruz* (2008) 44 Cal.4th 636, 680

13

["Defendant … removed the weapon from its hidden location and intentionally shot Deputy Perrigo in the back of the head 'by surprise with no opportunity [for the deputy] to resist or defend himself ….' "].)

Torres argues that to the extent the evidence was sufficient to support the special circumstance finding, section 190.2, subdivision (a)(15)—the lying-in-wait special circumstance statute—would be unconstitutionally vague as applied to him. He contends the allegedly vague statute deprived him of due process because it did not give him sufficient notice of whether his conduct was prohibited and did not provide guidelines to prevent its arbitrary and discriminatory enforcement. We disagree.

"Generally, there are two separate and distinct legal theories for challenging a statute on vagueness grounds, depending on the interests at stake. [Citation.] A person challenging aggravating circumstance statutes in death penalty cases brings such [a challenge] under the Eighth Amendment, asserting 'the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with … open-ended discretion ….' " (*People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 309 (*Bradway*).) In noncapital cases, like the present one, "the challenge comes under the due process clause and 'rest[s] on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.' " (*Ibid.*; see *People v. Andreasen* (2013) 214 Cal.App.4th 70, 79–80.)

Our decision in *Bradway* is instructive. In that case, the evidence showed a murder defendant "decided to kill his victim, established a ruse to take her by surprise, prepared a weapon he could conceal when he went to her home under the ruse, where he watched and waited for an opportune time to strike his unsuspecting victim from a position of advantage, and …

14

did so strike her according to his plan." (*Bradway*, *supra*, 105 Cal.App.4th at p. 309.) The trial court granted the defendant's motion to dismiss a lying-in-wait special circumstance allegation on grounds that section 190.2, subdivision (a)(15) was unconstitutionally vague, but we issued a writ of mandate directing the court to reinstate the special circumstance allegation. (*Id.* at pp. 302–303, 311.)

As we explained in *Bradway*, section 190.2, subdivision (a)(15) "provides a clear definition of what is required to satisfy its elements." (*Bradway*, *supra*, 105 Cal.App.4th at p. 310.) Applying that clear definition, "[a]ny reasonable person considering [the defendant]'s conduct, or planning similar acts, would know that those acts constituted murder by means of lying in wait and that the special circumstance could be alleged if the person in addition specifically intended to kill his victim by such means." (*Ibid.*) Further, we concluded "the statute is clear as to what conduct would subject a person to possible punishment by death or [life without parole]," and thus had sufficient guidelines to prevent arbitrary and discriminatory enforcement, notwithstanding the fact that the statute permitted the prosecutor to exercise discretion whether to seek the death penalty. (*Ibid.*)

These principles are equally applicable here. Like the *Bradway* court, we conclude section 190.2, subdivision (a)(15) gives clear notice of the conduct that it prohibits and does not pose a danger of arbitrary and discriminatory enforcement. (*Bradway*, *supra*, 105 Cal.App.4th at p. 310.) We further conclude any reasonable person in Torres's position would be on notice that the conduct in which he engaged—assuaging the victim's safety concerns, meeting the victim under the pretense of a drug deal, luring the victim into a sense of security, excusing himself to covertly load his pistol with ammunition, and suddenly shooting the victim in the back of the head—

15

would constitute a surprise attack from a "position of advantage," (*id.* at p. 309), and justify a lying-in-wait special circumstance finding under section 190.2, subdivision (a)(15).  The application of the lying-in-wait special circumstance statute in such a scenario does not offend the due process clause.

2

*Corpus Delicti Rule*

The jury found Torres guilty of possessing drug paraphernalia during the initial high-speed chase that ended with his arrest in Mexico.  At the time of Torres's arrest, he admitted to authorities that he took four hits off a methamphetamine pipe 30 minutes before the chase.  Torres claims we should reverse his conviction for possession of drug paraphernalia on grounds that the prosecution relied exclusively on his extrajudicial admission to prove the corpus delicti for the charged offense.

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168, 1169 (*Alvarez*).)  California has adopted a common law rule providing that "the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant." (*Id.* at p. 1169.)  There must be some independent proof, apart from the defendant's extrajudicial admissions, of the corpus delicti. (*Id.* at pp. 1170–1171.)  The purpose of the corpus delicti rule is to "ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened." (*Id.* at p. 1169; see *Rayyis v. Superior Court* (2005) 133 Cal.App.4th 138, 145.)

16

As the law currently stands, the corpus delicti rule generally applies in two scenarios.  First, "[w]henever an accused's extrajudicial statements form part of the prosecution's evidence, the cases have additionally required the trial court to *instruct* sua sponte that a finding of guilt cannot be predicated on the statements alone." (*Alvarez, supra*, 27 Cal.4th at p. 1170.)  Second, appellate courts will entertain "claims that a conviction cannot stand because the trial record lacks independent evidence of the corpus delicti."[4]  (*Alvarez,* at p. 1170.)  The present case presents an example of the second type of application.

" 'The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small.' " (*People v. Krebs* (2019) 8 Cal.5th 265, 317; see *Alvarez, supra*, 27 Cal.4th at p. 1181 ["[T]he modicum of necessary independent evidence of the corpus delicti, and thus the jury's duty to find such independent proof, is not great."].)  "The independent evidence may be circumstantial, and need only be 'a slight or prima facie showing' permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues." (*Alvarez*, at p. 1181.)  " 'The inference [that a crime has been committed] need not be "the only, or even the most compelling, one ... [but need only be] a *reasonable* one." ' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 722.)

---

4      Historically, courts applied the corpus delicti rule in a third scenario— as a rule governing the admissibility of evidence. (*Alvarez, supra*, 27 Cal.4th at p. 1170.)  However, our Supreme Court concluded that the "Right to Truth-in-Evidence" provision of article I of the California Constitution abrogated the corpus delicti rule to the extent it precluded the admission of a defendant's otherwise relevant and admissible extrajudicial statements. (*Alvarez*, at pp. 1172–1173, 1174–1177.)

As Torres notes, no methamphetamine pipe or photographic evidence of a methamphetamine pipe was introduced into evidence. Nevertheless, we conclude the prosecution made the slight showing necessary to satisfy the corpus delicti rule. During its examination of the arresting sergeant, the prosecution questioned the sergeant whether "anything related to the consumption of crystal methamphetamine" was found in Torres's vehicle during an inventory search and he replied, "Yes." The sergeant continued, "[F]rom my experience, it appeared to be crystal meth for smoking meth." The prosecution then asked, "How is crystal meth used in a glass pipe?" The sergeant replied, "It is used with a lighter and smoked. [¶] ... [¶] ... Holding it with one hand and lighting it with another object."

The arresting sergeant's testimony, particularly his reference to "crystal meth," was not the model of clarity. As all parties agree, it appears the sergeant misspoke when he referred to "crystal meth" or there was a mistranscription in the reporter's transcript. Even so, the sergeant's unequivocal testimony that something "related to the consumption of crystal methamphetamine" was found during the inventory of Torres's vehicle, and the found item was used "for smoking meth," was sufficient to establish a prima facie case of Torres's possession of a "device, contrivance, instrument, or paraphernalia" used for smoking methamphetamine.[5] (Health & Saf. Code, § 11364.)

---

[5] Like the parties, we believe it is clear that either the sergeant misspoke or there was a mistranscription in the reporter's transcript. This is apparent from the context of the sergeant's perplexing reference to "crystal meth for smoking meth." The prosecutor did not seek to clarify the sergeant's testimony and instead began to question the sergeant about how a drug user would use a glass pipe to smoke crystal meth. Further, the sergeant testified during the preliminary hearing that "a glass pipe used for smoking meth" was recovered from Torres's vehicle.

Additionally, the prosecution introduced evidence that Torres was under the influence of methamphetamine when he was arrested. An officer testified he performed a drug recognition examination of Torres and concluded, based on his evaluation and Torres's clinical signs, that Torres was under the influence of a central nervous stimulant like methamphetamine. A blood test performed on Torres indicated a positive test result for amphetamines and methamphetamines as well. Considered together with the sergeant's testimony that a glass pipe can be used to smoke methamphetamine, the evidence establishing that Torres was under the influence of methamphetamine gave rise to a reasonable inference that he came to be under the influence of methamphetamine by smoking methamphetamine with a glass pipe or other drug paraphernalia.

3

*Evidentiary Error*

The People elicited testimony from two of the three tenants who lived in the apartment that Torres entered during his unsuccessful pursuit of Ceron. Both witnesses were away from the apartment during the burglary. However, one of the witnesses testified that the third tenant, who did not testify, told him he was home when the burglary occurred.

Torres challenges the admission of the third tenant's out-of-court statement on hearsay grounds. He asserts the admission of the statement prejudiced him because it was the only evidence supporting the jury's finding that a person, other than an accomplice, was present in the apartment during the commission of the burglary.

Torres's trial counsel did not make a timely hearsay objection. Further, there is no indication in the record, or argument made on appeal, that a hearsay objection would have been futile. Therefore, Torres's hearsay

19

argument is forfeited.  (Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion[.]"]; *People v. Stevens* (2015) 62 Cal.4th 325, 333 ["[T]he failure to object to the admission of expert testimony or hearsay at trial forfeits an appellate claim that such evidence was improperly admitted."].)

Torres concedes his counsel did not make a hearsay objection, but contends his counsel was ineffective for not objecting.  "Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result."  (*People v. Dennis* (1998) 17 Cal.4th 468, 540.)

In assessing whether Torres's trial counsel was deficient, we must remain mindful that "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel."  (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)  Where, as here, the record " ' "sheds no light on why counsel acted or failed to act in the manner challenged," ' " we must reject the claim ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' "  (*People v. Caro* (2019) 7 Cal.5th 463, 488 (*Caro*).)

Torres's trial counsel was not asked for an explanation and we are persuaded there are satisfactory explanations for his conduct. Competent counsel could have determined that a meritorious hearsay objection would cause the People to call the third tenant to testify and he might provide damaging testimony against Torres, either by positively identifying Torres as the perpetrator or by describing the distress he suffered during the burglary. Alternatively, competent counsel could have determined a true finding on the burglary allegation was "virtually a foregone conclusion," and Torres's prospects of obtaining an acquittal on the more serious murder charge "would be improved if the defense refrained from placing its 'credibility' at risk" by making evidentiary objections that, even if sustained, were ultimately immaterial to the overall outcome. (*People v. Carter* (2005) 36 Cal.4th 1114, 1190.) "Or the jury may have looked bored, and the stimulus of an objection may have awakened the jurors' interest in a counterproductive way." (*People v. Ramirez* (2019) 40 Cal.App.5th 305, 311.) Because any of these explanations is satisfactory, we conclude this is not "the rare case" in which a failure to object or request a jury admonition gives rise to a claim of ineffective assistance of counsel. (*Caro, supra*, 7 Cal.5th at p. 514.)

4

*Instructional Error*

Avila's role in the murder of Arroyo was disputed in the proceedings below. He was not charged with murder, but he was charged with robbery (for the taking of methamphetamine from Arroyo) and for being an accessory to a felony. Avila pleaded guilty to being an accessory to a felony and thereafter provided inculpatory testimony against Torres as a witness for the prosecution.

Throughout Torres's trial, the defense theorized that Avila was the shooter and Torres was unaware of Avila's plans to kill Arroyo. The prosecution, on the other hand, maintained that Torres was the shooter and Avila was unaware of Torres's plans to kill Arroyo. In the alternative, it urged the jury to convict Torres of murder as an aider and abettor even if it determined Avila was the shooter.[6] Because Avila gave incriminating testimony as a prosecution witness and the parties disputed his role, if any, in Arroyo's murder, the trial court gave a standard jury instruction concerning accomplice testimony (CALCRIM No. 334).

The jury instruction given by the trial court, without objection or modification, read in pertinent part as follows:

> Before you may consider the statement or testimony of Jaen Soto AVILA as evidence against the defendant regarding the crimes charged in Counts 6, 7, 8, and 9, you must decide whether Jaen Soto AVILA was an accomplice to those crimes. A person is an accomplice if he is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if: [¶] 1. He personally committed the crime; [¶] [OR] [¶] 2. He knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime.

> The burden is on the defendant to prove that it is more likely than not that Jaen Soto AVILA was an accomplice. [¶] ... [¶]

> If you decide that a witness was not an accomplice, then supporting evidence is not required and you should evaluate his statement or testimony as you would that of any other witness.

---

[6] During the jury instruction conference, the defense posited that the jury might reject all these theories and conclude that Torres "went in there for the drug deal and the drug deal went bad and that's when he shot and killed her."

If you decide that a witness was an accomplice, then you may not convict the defendant of the crimes charged in Counts 6, 7, 8, and 9 based on his statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony[]; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes….

Torres challenges the portion of the instruction placing on him the burden of proving that Avila was an accomplice. He contends the allocation of the burden of proof impermissibly shifted the prosecution's burden of proving each element of the murder charge beyond a reasonable doubt. In assessing Torres's claim of instructional error, we apply a de novo standard of review.[7] (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

The standard jury instruction given by the trial court is modeled after section 1111, which states in relevant part as follows: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense …." (§ 1111.) An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in

---

[7] Torres's trial counsel did not object to the accomplice testimony instruction. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 (*Guiuan*) [defendant failed to object and thus forfeited claim that court erred by giving standard accomplice testimony instruction].) However, we exercise our discretion to address the merits of Torres's claim of instructional error, notwithstanding his failure to object, to forestall a claim of ineffective assistance of counsel. (*People v. Riel* (2000) 22 Cal.4th 1153, 1192; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.)

which the testimony of the accomplice is given." (*Ibid*.)  Thus, an accomplice encompasses " '[a]ll persons concerned in the commission of a crime, whether ... they directly commit the act constituting the offense, or aid and abet in its commission ....' " (*People v. Avila* (2006) 38 Cal.4th 491, 564, quoting § 31.)

The requirement that inculpatory accomplice testimony be corroborated reflects a legislative determination that such testimony presents reliability concerns.  (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.)  "To the extent an accomplice testifies on behalf of the prosecution, the testimony is subject to the taint of an improper motive, i.e., that of promoting his or her own self interest by inculpating the defendant." (*Guiuan*, *supra*, 18 Cal.4th at p. 568.) By precluding a conviction based on accomplice testimony alone, the corroboration rule inures to the benefit of the defendant.  (See *People v. Belton* (1979) 23 Cal.3d 516, 526; *In re Christopher B.* (2007) 156 Cal.App.4th 1557, 1561.)

As noted, Torres contends the instruction erroneously shifted the prosecution's burden of proving each element of the offense.  We disagree. " '[T]he Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." ' " (*People v. Frye* (1998) 18 Cal.4th 894, 968 (*Frye*), disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  However, the issue of whether a witness is an accomplice is generally a collateral issue that need not be established in the direct chain of proof of the crime.  (*Frye*, at pp. 964–968; *People v. Tewksbury* (1976) 15 Cal.3d 953, 968 ["The degree of proof by which an accused must establish that a witness is an accomplice is the same as in other instances wherein he has the burden of establishing a collateral fact …."]; see *People v. Martinez* (2019) 34 Cal.App.5th 721, 730 (*Martinez*) [a witness' status as an accomplice

24

bears on an element of a crime if the crime requires proof of an accomplice].) Because the issue typically "has no bearing on the prosecution's proof of any element of the charged crime, there is no constitutional impediment to placing on a defendant the burden of proving, by a preponderance of the evidence, a witnesses' status as an accomplice." (*Frye*, at p. 968; see *Tewksbury*, at p. 965.)

Notwithstanding this general rule, Torres claims the prosecution bore the burden of proving that Avila was an accomplice because Torres's main defense was that Avila was the perpetrator of the crime. According to Torres, the allocation of the burden of proof, as set forth in the jury instruction, impermissibly "told jurors that Mr. Torres had to prove by a preponderance of the evidence that Avila was the killer." We are not persuaded.

As an initial matter, Torres is incorrect that the instruction effectively required him to prove Avila was the killer. The term "accomplice" encompasses both direct perpetrators of offenses as well as aiders and abettors. (§§ 31, 1111; *People v. Avila, supra*, 38 Cal.4th at p. 564.) Thus, under the instruction given by the trial court, Torres could have established Avila's status as an accomplice if he demonstrated, by a preponderance of the evidence, either that Avila was the direct perpetrator or that he aided and abetted in the commission of the offense.

More importantly, the fact that Torres proffered a defense that Avila was the shooter had no bearing on whether the prosecution was required to prove Avila's accomplice status in the direct chain of proof. Because acting with an accomplice is not an element of the crime of murder, due process did not require the prosecution to bear the burden of proving that factual issue

beyond a reasonable doubt.[8] (§ 187 [murder statute]; *Martinez, supra,* 34 Cal.App.5th at p. 730.)

Even if the instruction was arguably erroneous, the error would be harmless under any standard of review. The trial court gave the jury numerous instructions conveying that the prosecution bore the burden of proof as to each element of the offense of murder, including CALCRIM Nos. 220 (Reasonable Doubt), 224 (Circumstantial Evidence: Sufficiency of the Evidence), 355 (Defendant's Right Not to Testify), 359 (Corpus Delicti: Independent Evidence of a Charged Crime), 520 (Murder), 521 (First Degree Murder), and 640 (Verdict Forms).

The parties reiterated the prosecution's burden of proof during closing arguments as well, further minimizing the possibility of prejudice. For example, the prosecution stated as follows: "It's the People's burden on all of these charges to prove to you the truth of the charges on all the counts …." Likewise, the defense informed the jury that "the burden lies entirely on the prosecution," "[i]t's all on the government," and the burden was "on the government … to overcome [the] presumption" of innocence. The defense further urged the jury to "demand that the government prove each and every element beyond a reasonable doubt."

Considering the record as a whole, we conclude the alleged instructional error was harmless. (*Martinez, supra,* 34 Cal.App.5th at pp. 730–731.)

---

8    Torres argues in passing that the allocation of the burden of proof interfered with his constitutional rights to a fair trial, to present a defense, and to argue his case in closing. To the extent these claims are preserved, they are without merit. Nothing in the instruction precluded Torres from presenting his defense that Avila was the killer. In fact, Torres questioned Avila on cross-examination as to whether he shot Arroyo and, during closing arguments, argued in detail that Avila was the killer.

*Fines, Fees, and Penalty Assessments*

The trial court imposed the following fines, fees, and penalty assessments as part of Torres's sentence: (1) a restitution fine of $10,000 (Pen. Code, § 1202.4) and a stayed parole revocation restitution fine of $10,000 (*id.*, § 1202.45); (2) a court operations assessment of $640 (*id.*, § 1465.8); (3) a criminal conviction assessment of $480 (Gov. Code, § 70373); (4) a criminal justice administration fee of $154 (Pen. Code, § 29550.1); (5) a crime prevention programs fine and penalty assessments totaling $39 (*id.*, § 1202.5); (6) a drug program fine and penalty assessments totaling $615 (Health & Saf. Code, § 11372.7); and (7) a crime lab fine and penalty assessments totaling $205 (*id.*, § 11372.5). The court did not hold a hearing on Torres's ability to pay.

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Torres contends the court's failure to conduct an ability-to-pay hearing before imposing these fines, fees, and penalty assessments violated his state and federal due process rights. We reject Torres's argument for three reasons.

First, Torres did not object based on his alleged inability to pay, even though the court imposed the statutory maximum restitution fine of $10,000 and Torres thus had every incentive to assert such an objection. Because Torres did not make an ability-to-pay objection, he has forfeited his due process argument. (See, e.g., *People v. Smith* (2020) 46 Cal.App.5th 375, 395–396; *People v. Keene* (2019) 43 Cal.App.5th 861, 863–864; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.)

Second, our court has declined to adopt the *Dueñas* court's due process analysis. Instead, we have concluded that due process does not " 'bar[] the imposition of … assessments and [a] … restitution fine' even as to a

defendant who is unable to pay." (*People v. Cota* (2020) 45 Cal.App.5th 786, 795; see *People v. Allen* (2019) 41 Cal.App.5th 312, 326 ["[W]e would adopt the reasoning of the numerous courts that have rejected *Dueñas*'s due process analysis."].)[9] For the reasons set forth in our prior decisions, we reject Torres's due process argument on the merits.[10]

Third, even if the trial court erred, any error was harmless because Torres "will have the ability to earn prison wages over a sustained period." (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139 (*Johnson*).) "Prison wages range from $12 to $56 per month, depending on the prisoner's skill level." (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076, citing Cal. Code Regs., tit. 15, § 3041.2 and Cal. Dept. of Corrections & Rehabilitation, Adult Institutions Operations Manual (2019), art. 12 (Inmate Pay), §§ 51120.1, 51120.6, pp. 354–356.) "The state may garnish between 20 and 50 percent of those wages to pay the section 1202.4, subdivision (b) restitution fine. (*Ibid.*, citing § 2085.5, subds. (a), (c).)

The fines, fees, and penalty assessments imposed in this case are not insubstantial. Nonetheless, Torres was just 23 years old at the time of

---

[9] See also *People v. Petri* (2020) 45 Cal.App.5th 82, 92 [rejecting "defendant's reliance on *Dueñas* to support his contention that due process required an ability-to-pay finding"]; *People v. Adams* (2020) 44 Cal.App.5th 828, 832 ["*Dueñas* was wrongly decided"]; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946 [the issue of whether to require defendants, "many of whom are people of little or no means, to pay assessments that help defray the costs of operating the court system and restitution fines" is "a question to which, in our view, the federal and California Constitutions do not speak and thus have left to our Legislature"]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067, 1068–1069 (*Aviles*) ["We find that *Dueñas* was wrongly decided …."].)

[10] Torres has disavowed any argument that the fines, fees, and penalty assessments violate the Eighth Amendment to the federal constitution.

sentencing. As noted in the probation report and by the defense during the sentencing hearing, Torres is physically and mentally healthy, is employable, has an employment history, has close ties with his family, and denies having any debt. Further, as a practical matter, our affirmance of the judgment means Torres will remain incarcerated for the remainder of his natural life. "While it may take [Torres] considerable time to pay the amounts imposed against [him], it is clear [he] can make payments from either prison wages or monetary gifts from family and friends during [his] lengthy prison sentence[]." (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060–1061; see *Johnson, supra,* 35 Cal.App.5th at p. 139.)

IV

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

I CONCUR:


O'ROURKE, J.

29

Dato, J., Concurring.

I concur in all aspects of the majority opinion save the discussion regarding the defendant's inability to pay the imposed fines, fees and assessments. (See generally *People v. Dueñas* (2019) 30 Cal.App.5th 1157.) As to that issue, I agree with the majority that Torres's argument is forfeited based on this court's reasoning in *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033. (Maj. opn. at p. 27.) But for the reasons expressed in my concurring and dissenting opinion in *People v. Cota* (2020) 45 Cal.App.5th 786, I do not subscribe to the majority's wholesale rejection of *Dueñas* in other contexts.[1] (*Cota*, at pp. 800–801.)

DATO, J.

---

[1] The relevance of a criminal defendant's inability to pay assessed fines and fees is currently pending before the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, 96, review granted November 13, 2019, S257844. *Kopp*, another inability-to-pay decision by a different panel of this court, agreed with portions of *Dueñas* and disagreed with others.